UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

————————————————

In re:

VIKKI PIZZANO,                                           Case No. 10-03590-swd
                                                         Chapter 7
                Debtor.                                  Hon. Scott W. Dales
_____/

JAMES W. BOYD, Chapter 7 Trustee, and
VIKKI SUE PIZZANO,

                Plaintiffs,

v.                                                       Adv. Proc. No. 10-80369

DIRECT CAPITAL CORPORATION,

                Defendant.
_____/


**OPINION AND ORDER  REGARDING
MOTION FOR PARTIAL SUMMARY JUDGMENT**

PRESENT: HONORABLE SCOTT W. DALES
United States Bankruptcy Judge

Plaintiffs Vikki Sue Pizzano and James W. Boyd commenced an adversary proceeding

against Defendant Direct Capital Corporation ("Direct Capital" or the "Defendant") alleging,

among other things, that the Defendant violated the automatic stay and converted the Debtor's

2000 Chevrolet Corvette convertible (the "Corvette") by repossessing it without colorable

authority.  Ms. Pizzano is a Chapter 7 Debtor (the "Debtor"), and Mr. Boyd is her bankruptcy

trustee (the "Trustee").  Pursuant to a prospective settlement, the Debtor and the Trustee

(collectively the "Plaintiffs") agreed to share the proceeds, if any, resulting from their claims

against Direct Capital.  The Plaintiffs filed a motion for partial summary judgment under Rule 56

(the "Motion," DN 24), contending that there is no genuine issue as to any material fact regarding the Defendant's alleged violation of the automatic stay and its supposed conversion of the Corvette.

The court has carefully reviewed the record and the parties' arguments and has decided to deny the Motion. The court concludes that the collateral description was sufficient to encumber the Corvette under New Hampshire's version of the Uniform Commercial Code (the "UCC"),[1] including Article 9 governing secured transactions. Because the Motion is premised on a contrary legal conclusion, the court will deny it.

With respect to the alleged automatic stay violations, the court concludes that genuine issues of material fact also preclude it from granting the Motion.

## I. JURISDICTION

The court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C. § 1334(a). To some extent, this proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), and (O) because it involves the administration of the estate and the automatic stay. To some extent, this proceeding is non-core because it involves a claim by the Trustee for recovery on a prepetition tort under state law. As set forth in the Pretrial Order dated September 23, 2010, the parties have consented to this court's entry of a final judgment.

---

[1] For convenience, and given the near identity among the states' versions of the UCC, in this Opinion the court will generally refer to the UCC rather than to a specific legislative enactment, except where indicated.

## II.  SUMMARY JUDGMENT STANDARDS

Rule 56, incorporated under Rule 7056, governs summary judgment in an adversary proceeding.  In considering a motion for summary judgment, the court will grant the motion only where there is no genuine issue of material fact.  *See* Fed. R. Civ. P. 56(c).  Specifically, the court should grant such a motion "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  *Id.*  A genuine issue of material fact exists where a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  In considering a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in their [sic] favor."  *Swekel v. City of River Rouge*, 119 F.3d 1259, 1261 (6th Cir. 1997) (quoting *Anderson*, 477 U.S. at 255).  Finally, the court looks to the applicable substantive law in evaluating the materiality of a factual issue.  *Anderson*, 477 U.S. at 248.

The UCC attachment question at issue in this Motion is primarily a legal one, requiring the court to decide whether a security agreement that purports to grant a security interest in "goods" sufficiently describes the Corvette within the meaning of either Michigan's or New Hampshire's version of the UCC.  The automatic stay issues, however, are more fact-dependent.

## III.  FACTS

The material and undisputed facts are as follows.  The Debtor became indebted to the Defendant pursuant to a "Master EFA Agreement" (the "Security Agreement") to finance her business.  The Security Agreement included the following choice of law provision:  "This EFA is

governed exclusively by the laws of New Hampshire." In addition, the Security Agreement contained the following granting clause and collateral description:

> 14. UCC FILINGS: You hereby grant Us a first priority security interest in the Equipment and authorize Us to file UCC Financing Statements or similar instruments to perfect such interest. You hereby grant Us a security interest in all goods, inventory, equipment, accounts, accounts receivable, investment property, securities, fixtures and other property now or hereafter belonging to You or in which You have an interest, and in all proceeds, including insurance proceeds thereof ("Collateral") and authorize us to file UCC Financing Statements or similar instruments to record such interest.

*See* Motion at Exh. A.

Direct Capital's alleged interest in the Corvette is not reflected on any certificate of title for the motor vehicle, and the parties agree that the interest, even if it attached, is not perfected.

After the Debtor's default, Direct Capital took possession of the Corvette, evidently relying on the Security Agreement and the UCC's "self help" repossession provisions. Roughly twenty days later, on March 23, 2010, the Debtor filed a voluntary petition for relief under Chapter 7, triggering the automatic stay. *See* 11 U.S.C. § 362(a).

Shortly after filing, the Debtor, through counsel, asked Direct Capital to return the Corvette, and when that did not occur, she filed a motion for turnover. According to the docket in the Debtor's base case, she withdrew the turnover motion before the hearing. Evidently, she and the Trustee were in negotiations regarding her exemption rights in the Corvette, and perhaps the Debtor felt she lacked standing while the dispute with the Trustee persisted.

On July 12, 2010, more than three months after the order for relief, Direct Capital returned the Corvette by delivering it to an auctioneer agreeable to the Plaintiffs.

On this Motion, the Plaintiffs have expressly refrained from seeking an order establishing damages, so the factual issues in this case regarding damages, including the condition and value

of the Corvette before and after repossession, are not ripe for decision. Rather, through this Motion, the Plaintiffs seek an order establishing Direct Capital's liability for conversion (common law and statutory), and for willfully violating the automatic stay.

## IV. ANALYSIS

A.      Choice of Law

By signing the Security Agreement, which contained a choice of law provision, the Debtor and the Defendant agreed that New Hampshire law would apply. Michigan and New Hampshire have enacted virtually identical UCC choice of law provisions. The applicable version enacted in Michigan provides in relevant part as follows:

> (1) Except as provided in this section, if a transaction bears a reasonable relation to this state and also to another state or nation, the parties may agree that the law either of this state or of the other state or nation shall govern their rights and duties. Failing agreement, this act applies to transactions bearing an appropriate relation to this state.
>
> (2) If 1 of the following provisions of this act specifies the applicable law, that provision governs and a contrary agreement is effective only to the extent permitted by the law (including the conflict of laws rules) specified:
>
> . . .
>
> Law governing perfection, the effect of perfection or nonperfection, and the priority of security interests and agricultural liens. Sections 9301 through 9307.

M.C.L. § 440.1105. Fairly read, this provision generally honors the parties' choice of law, limiting that choice with respect to perfection and priority, but not with respect to attachment. Here, because Direct Capital is a New Hampshire-based lender, the transaction between Direct Capital and the Debtor bears a reasonable relationship to New Hampshire. The court, therefore,

will apply New Hampshire law to the attachment issues, while recognizing that Michigan and New Hampshire law are nearly identical in all respects material to questions involving the Defendant's alleged security interest.

The parties' agreement, however, did not determine which state's tort law would apply, only that New Hampshire law would govern their agreement (and therefore issues involving attachment of a security interest). In the absence of any authority or other reason to displace Michigan's tort law, and given the undisputed fact that if the conversion occurred, it happened in this state, the court will apply Michigan law, including M.C.L. § 600.2919a. *See Gass v. Marriott Hotel Services, Inc.*, 558 F.3d 419, 425 (6th Cir. 2009); s*ee also In re Dow Corning Corp.*, 419 F.3d 543, 548 (6th 2005) (noting that choice of law rules in bankruptcy are unsettled).

To summarize, the court will look to Michigan's law governing conversion, including M.C.L. § 600.2919a, but will consult New Hampshire law to determine whether Direct Capital had a security interest in the Corvette. The conversion counts, therefore, depend to some extent on both New Hampshire and Michigan law.

B.    Conversion Claims

In Michigan, conversion consists of "any distinct act of domain wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *See Head v. Phillips Sales and Camper Rental, Inc.*, 593 N.W.2d. 595 (Mich. App. 1999) (*citing Foremost Ins. Co. v. Allstate Ins. Co.*, 486 N.W.2d 600 (Mich. 1992)). The gravamen of conversion is the non-privileged interference with superior possessory rights, generally in tangible property.

Here, the parties evidently agree that if Direct Capital had an enforceable security interest in the Corvette, the conversion counts must fail. This makes sense because after default, assuming that its security interest attached, Direct Capital had a superior right to possession. *See*

M.C.L. § 440.9609(1)(A) (secured party may take possession of collateral after default). Consequently, if Direct Capital had a security interest in the Corvette, whether perfected or not,[2] it had a superior possessory right after default which would preclude the Plaintiffs' recovery under a conversion theory.

The parties disagree about whether the Debtor's granting clause quoted above sufficiently describes the Corvette in a manner that permits Direct Capital's supposed security interest to attach to that property.  The applicable UCC provision provides as follows:

> (a) Sufficiency of description.  Except as otherwise provided in subsections (c), (d), and (e), a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described.
>
> (b) Examples of reasonable identification.  Except as otherwise provided in subsection (d), a description of collateral reasonably identifies the collateral if it identifies the collateral by:
>
>  . . .
>
>  (3) except as otherwise provided in subsection (e), a type of collateral defined in this chapter . . .

N.H. Rev. Stat. 382-A:9-108; *cf.* M.C.L. § 440.9108.  The statutory exceptions to the typical collateral descriptions are as follows:

> (c) Supergeneric description not sufficient.  A description of collateral as "all the debtor's assets" or "all the debtor's personal property" or using words of similar import does not reasonably identify the collateral.
>
>  . . .

---

[2] A security interest is enforceable between the secured creditor and the debtor irrespective of perfection under UCC § 9-203.  *See also* N.H. Rev. Stat. 261:14(IV) (motor vehicle code).  Because the Trustee is claiming through the Debtor with respect to the conversion counts and not relying on his strong-arm powers and status as *bona fide* purchaser, perfection is immaterial to this Motion.

> (e) When description by type insufficient.  A description only by type of collateral defined in this chapter is an insufficient description of:
>
> > (1)  a commercial tort claim; or
> > (2) in a consumer transaction, consumer goods, a security entitlement, a securities account, or a commodity account.

*Id.*  At the outset, the court agrees with the Trustee that Direct Capital cannot rely on the phrase "other property now or hereafter belonging to [Debtor] or in which [Debtor has] an interest," because that phrase is tantamount to the supergeneric description condemned by N.H. Rev. Stat. 382-A:9-108 at least for purposes of attachment.  The issue, therefore, is whether the Debtor's grant of a security interest in "Goods" sufficiently describes the Corvette under N.H. Rev. Stat. 382-A:9-108.

Certainly, the Corvette falls within the UCC definition of goods because it was moveable at the time of attachment.[3]  The parties appear to agree that the Corvette also qualifies as "consumer goods," which both New Hampshire and Michigan define as "goods that are used or bought for use primarily for personal, family, or household purposes."  N.H. Rev. Stat. 382-A:9-102(23); M.C.L. § 440.9102(w).

Because the Plaintiffs rely on UCC § 9-108 to disqualify Direct Capital's security interest in the Corvette, and because that statute declares that a collateral description "reasonably identifies the collateral if it identifies the collateral by . . . type of collateral defined in the uniform commercial code," the court must consider whether the term "Goods" qualifies as a "type" of "collateral" defined in the UCC.

Putting aside for the moment the question of the sufficiency of description, there is no doubt that a secured party may take a security interest in goods, and that goods may serve as

---

[3] New Hampshire, like Michigan, defines "goods" as "all things that are movable when a security interest attaches." N.H. Rev. Stat. 382-A:9-102(44); M.C.L. § 440.9102(rr).

"collateral" -- a term that means "property subject to a security interest or agricultural lien." N.H. Rev. Stat. 382-A:9-102(12); M.C.L. § 440.9102(*l*).  The parties agree, as they must, that the term "goods" is defined in the UCC.  Under a natural reading of the statute, goods are a type of collateral defined in the UCC, and a security agreement that describes collateral as "goods" sufficiently describes a motor vehicle within the meaning of UCC § 9-108.[4]

The Motion stands on two legs in opposing this natural reading.  First, the Plaintiffs make a textual argument:  the term "Goods" is a supergeneric description that UCC § 9-108(c) prohibits.  It is akin to "all the debtor's assets" or "all the debtor's personal property" or "words of similar import" that, as a matter of law, do not reasonably identify the collateral.  Second, they make a policy or fairness argument:  using the term "Goods" to encumber the Corvette unfairly surprises the Debtor, who is an individual, and would also reach her food, pets, and clothing -- an "unthinkable" result.  *See* Plaintiff's Post-Hearing Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment as to Counts I, II and IV of Plaintiffs' Complaint ("Post-Hearing Brief," DN 38), at p. 3.  The court disagrees with both the textual and fairness arguments.

The court rejects the textual argument because the term "goods" is not akin to "all assets" and "all property."  The latter terms are broader than the term "goods" and include both tangible and intangible property.  In contrast, the term "goods" substantially narrows the universe of collateral by eliminating such common commercial collateral as "general intangibles," "accounts," "chattel paper," "money" and many other important categories of collateral.  In

---

[4]  The court is not alone in concluding that "goods" are a "type" of collateral defined in the UCC.  A United States District Court in Pennsylvania observed that "the drafters expected 'goods' and 'accounts,' and other categories of collateral defined in former Article 9, to constitute "types of collateral . . ."  *Interbusiness Bank v. First National Bank of Mifflintown,* 318 F. Supp.2d 230, 243 (M.D. Pa. 2004) (addressing issue in context of perfection rather than attachment).

addition, unlike the words "assets" and "property," the term "goods" is defined in the UCC. For these reasons, the term "goods" is not a term "of similar import" to "all assets" or "all property."

The Plaintiffs argue, based upon the UCC's official commentary, that the "types" of collateral comprising goods include (only) inventory, equipment, consumer goods, and farm products. *See* Post-Hearing Brief at p. 2 (*citing* UCC § 9-102, official comment 4.a). More specifically, the Plaintiffs rely on the following comment:

Page 10 of 15

> This Article also retains the four mutually-exclusive "types" of collateral that consist of goods: "consumer goods," "equipment," "farm products," and "inventory."

*See* UCC § 9-102, official comment 4.a. The Plaintiffs paraphrase it this way:

> In other words, the term "goods" includes four mutually exclusive "types" of collateral, one of which is "consumer goods." "Goods," although defined in the UCC, is not a "type of collateral."

*See* Post-Hearing Brief at p. 3. First, the court notes that there are more than four types of "goods" defined in the UCC, as that term includes "fixtures," and "accessions" as well as other types of collateral not defined (such as standing timber, unborn young, crops). The Plaintiffs' argument would seem to suggest that fixtures are not a "type" of collateral defined in the UCC, a dubious proposition.

Moreover, accepting the Plaintiffs' argument might also disqualify "General Intangibles" as a "type" of collateral defined in the UCC simply because the term is divided into smaller categories, such as "payment intangibles" and "software." Again, this is a shaky but logical extension of the Plaintiffs' argument. The court does not believe that the fact that "goods" is defined to include other subclasses or types of collateral means that the term "goods" is not itself a "type" of collateral within the meaning of UCC § 9-108. The Plaintiffs' strained interpretation ignores revised Article 9's intent to simplify secured transactions. It also reads too much into the

commentary, sacrificing the statute's plain meaning and purpose.  The court concludes that goods are a type of collateral defined in the UCC.

The court also rejects the Plaintiffs' fairness argument -- that permitting Direct Capital to encumber the Corvette is unfair because the Debtor is an individual.  In essence, the Plaintiffs argue that Direct Capital should not be permitted to encumber a consumer good by using the term "Goods" in a security agreement.  This argument, however, ignores the fact that the drafters of UCC § 9-108 have concluded that describing collateral by "type" should be forbidden only in two narrow circumstances not applicable here:   (1) transactions involving commercial tort claims, and (2) "in a consumer transaction," transactions involving "consumer goods, a security entitlement, a securities account, or a commodity account."

Although the Corvette may qualify as a "consumer good," the financing transaction between the Debtor and Direct Capital is not a "consumer transaction,"[5] and, therefore, describing collateral by type (here "Goods") will suffice.  In other words, the drafters of UCC § 9-108 have considered the argument and rejected it in favor of contractual freedom.  The UCC provides consumer protection measures, but generally only in consumer transactions and consumer-goods transactions.  The transaction under review is not of that ilk.

Nor does the court find the Plaintiffs' case law persuasive.  *See Chrysler v. International Harvester Credit Corp (In re Cossairt),* 43 B.R. 41 (Bankr. W.D. Mich. 1984); *Citizens Commercial & Savings Bank v. Eldridge*, 10 B.R. 835 (Bankr. E.D. Mich. 1981); *GMAC v. Bolinger (In Re Bolinger)*, 3 B.R. 186 (Bankr. E.D. Mich. 1980).  First, each of these cases was

---

[5] The term "consumer transaction" means "a transaction in which an individual incurs an obligation primarily for personal, family, or household purposes, a security interest secures the obligation, and the collateral is held or acquired primarily for personal, family, or household purposes."   N.H. Rev. Stat. 382-A:9-102(26): M.C.L.§440.9102(z).  There is no genuine issue of fact regarding the commercial nature of the Debtor's transaction with Direct Capital, the purpose of which was to finance a commercial enterprise.

decided well before the states adopted revised Article 9, which, unlike former Article 9, expressly blesses categorical descriptions for all sorts of collateral, not just investment property.[6]

Second, in *dicta*, the cases appear to adopt the so-called "serial number test," ignoring the impetus behind Article 9: to simplify secured transactions by eschewing a hyper-technical approach to routine matters, including collateral descriptions.

Third, the cases are distinguishable because each involved a misdescription of collateral. The general observations about how to create a security interest in motor vehicles are, in each case, *dicta*. For example, in *Bolinger*, the sole issue was "whether or not it is a fatal defect to describe the collateral in the installment sale contract and security agreement as a 'Chevrolet' when, in fact it was a 'Pontiac.'" Although the court opined that the only way to adequately describe a motor vehicle in a security agreement is by reference to serial number, that opinion exceeded the scope of the issue. The *Bolinger* court held only that a security interest does not attach to a Pontiac if the security agreement describes it as a Chevrolet. There was no occasion to consider whether describing a motor vehicle as "goods" in a non-consumer transaction would suffice. The controversy in *Eldridg*e, like that in *Bolinger*, involved an incorrect collateral description because the creditor used the wrong vehicle identification number. The *Cossairt* case, like *Bolinger* and *Eldridge*, also involved a defective collateral description -- the vehicle identification number changed after the collateral underwent substantial repairs. None of these fact patterns is sufficiently analogous to the facts before the court today to make those cases persuasive, let alone controlling.

Fourth, although a less weighty consideration given the uniform nature of the UCC, the Plaintiffs' cases construed Michigan law. The court has determined that New Hampshire law

---

[6] *See* UCC § 9-108, official comment 2 (noting that former Article 9 expressly authorized categorical descriptions only with respect to investment property under former UCC § 9-115).

governs the parties' Security Agreement, and the Plaintiffs have not cited any cases from New Hampshire comparable to the three Michigan bankruptcy opinions.

Because the court concludes that Direct Capital's use of the term "Goods" in its Security Agreement sufficiently describes the Corvette, the Motion fails on this point.

C.      Automatic Stay Claims

The Motion seeks an order establishing Direct Capital's liability for willfully violating the automatic stay because (1) the Corvette was and remains property of the estate, notwithstanding the prepetition repossession;[7] (2) Direct Capital delayed in returning the Corvette for over three months; and (2) the record suggests that Direct Capital, through email correspondence, was attempting to use its control over the Corvette to gain an advantage with respect to other property of the estate, specifically, collateral the Debtor formerly used in connection with her business.

If the court were permitted to draw inferences in the Plaintiffs' favor, the court might agree that Direct Capital, presumably a sophisticated multi-state creditor, did not return the Corvette with the dispatch that 11 U.S.C. §§ 362 and 542 require.  On a summary judgment motion, however, the court is not permitted to draw inferences in the moving party's favor, but instead must draw them in favor of the non-moving party, Direct Capital.

In response to the Motion, Direct Capital submits the Corrected Affidavit of Ryan Hodsdon, who explains that Direct Capital made repeated requests to the Plaintiffs for

---

[7] The creditor's repossession without more did not terminate the Debtor's interest (and derivatively the estate's interest) in the Corvette because Direct Capital had not disposed of its collateral either through strict foreclosure or sale as contemplated in M.C.L. §§ 440.9610 or 440.9620.  Without a disposition under the UCC, the Debtor's interest in the Corvette had not been transferred either to Direct Capital or a purchaser at a foreclosure sale, and therefore remained vested in the Debtor, subject to Direct Capital's security interest. *See* M.C.L. § 440.9617(1)(a) (disposition transfers debtor's interest in collateral); *id.* § 440.9622 (acceptance of collateral transfers debtor's interest); *see also In re Sanders,* 291 B.R. 97 (Bankr. E.D. Mich. 2003).

instructions about where to return the Corvette.  Though Mr. Hodsdon was aware of the Debtor's turnover motion, the Debtor withdrew that motion.  The court's docket also suggests that the Debtor and the Trustee were in negotiations about the Debtor's exemption rights, including those existing in the Corvette.  This may have contributed to Direct Capital's supposed uncertainty about where to return the vehicle.  Drawing inferences in Direct Capital's favor, there is a genuine issue of material fact about whether the Defendant willfully violated the automatic stay. The creditor's uncertainty about which of the Plaintiffs was entitled to post-petition possession, if established at trial, might preclude a finding of willfulness.  Testimony may also establish that Direct Capital was not a sophisticated creditor, or at least not as sophisticated as it seems. Although the three month delay in returning a debtor's automobile strikes the court as presumptively improper, the procedural posture of the Motion and the inherently factual nature of a willfulness finding together persuade the court to deny the Motion, without prejudice to renewal in accordance with the Pretrial Order dated September 23, 2010, following discovery.

Accordingly, the court will deny the Motion to the extent it seeks an order establishing liability for willful stay violations in connection with the Corvette.

### V.  CONCLUSION AND ORDER

Where, as here, the court has determined to deny a summary judgment motion, the court "should, to the extent practicable, determine what material facts are not genuinely at issue."  Fed. R. Civ. P. 56(d).  From the foregoing, the court concludes that Direct Capital had an enforceable (though unperfected) security interest in the Corvette, repossessed the vehicle on March 3, 2010, and did not return it until sometime after July 12, 2010 -- three months after the Debtor filed her voluntary Chapter 7 bankruptcy petition.

The court has not dismissed the conversion counts at this time because Direct Capital did not move for such relief.  If the Plaintiffs believe, as the court assumes, that the conversion counts cannot survive the court's analysis, the court encourages the parties to enter into a stipulation narrowing the issues for trial, of course preserving the Plaintiffs' right to seek appellate review of the court's ruling on the UCC issues.

NOW, THEREFORE, IT IS HEREBY ORDERED that the Motion (DN 24) is DENIED.

IT IS FURTHER ORDERED that the Clerk shall serve a copy of this Opinion and Order pursuant to Fed. R. Bankr. P. 9022 and LBR 5005-4 upon Susan Jill Rice, Esq., Jonathan R. Moothart, Esq., and Jeffrey C. Alandt, Esq.

**IT IS SO ORDERED.**



Scott W. Dales
United States Bankruptcy Judge

**Dated: October 22, 2010**